UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JERI L. COSTON,                                    Case No. 20-12060

                Plaintiff,          Judith E. Levy
v.                                                 United States District Judge

ANDREW SAUL,                                       Curtis Ivy, Jr.
COMMISSIONER OF SOCIAL                             United States Magistrate Judge
SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 14, 17)**

Plaintiff Jeri L. Coston ("Coston") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Social Security Disability Insurance ("SSDI") Benefits under the Social Security Act (the "Act"). This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's motion for summary judgment (ECF No. 14), the Commissioner's cross-motion for summary judgment (ECF No. 17), Plaintiff's reply (ECF No. 18) and the administrative record (ECF No. 11).

For the reasons below, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment (ECF No. 14), **GRANT** Defendant's

motion for summary judgment (ECF No. 17), and **AFFIRM** the Commissioner's decision.

## I.    DISCUSSION

### A.    Background and Administrative History

Plaintiff alleges her disability began on February 2, 2017, at the age of 49. (ECF No. 14, PageID.1122-23).  She applied for SSDI benefits on November 4, 2017.  (*Id.* at PageID.1122).  In her disability report, she listed several ailments which diminished her ability to work.  (*Id.*).  The ailments included: (1) degenerative disc with desiccation lumbar L3-L4-L5-S1; (2) annular tear and bulging with nerve impingement L3-S1; (3) thoracic degenerative discs with osteoarthritis; (4) herniation of lumbar L4-L5; (5) right shoulder tendinosis, bone spurs, and enchondroma; (6) right shoulder calcification of the supraspinatus tendon; (7) ulcerative colitis; (8) fibromyalgia; (9) anxiety; (10) and chronic pain. (ECF No. 11, PageID.231).  Her application was denied on May 20, 2018.  (*Id.* at PageID.57).

Following the denial, Plaintiff requested a hearing by an Administrative Law Judge ("ALJ").  (ECF No. 14, PageID.1122).  On July 25, 2019, ALJ Manh Nguyen held a hearing, at which Plaintiff and a vocational expert ("VE"), Michelle Ross, testified.  (ECF No. 11, PageID.80).  On September 11, 2019, the ALJ issued

an opinion, which determined that Plaintiff was not disabled within the meaning of the Social Security Act. (*Id.* at PageID.54).

Plaintiff later submitted a request for review of the hearing decision. (ECF No.14, PageID.1123). On June 2, 2020, the Appeals Council denied Plaintiff's request for review. (*Id.*). Thus, the ALJ's decision became the Commissioner's final decision.

Plaintiff timely commenced the instant action on July 31, 2020.

### B.   **Plaintiff's Medical History**

#### 1.   Physical Impairments

##### a)   Shoulder Issues

On January 11, 2017, Plaintiff reported right shoulder pain to Lakshmana Madala, M.D. (ECF No. 11, PageID.393). Colleen Linehan, M.D., an orthopedic surgeon, noted on March 9, 2017 that Plaintiff reported 10/10 sharp and stabbing shoulder pain, which worsened with movement. Past Toradol injections lessened pain for about three weeks. Plaintiff's Transcutaneous Electrical Nerve Stimulation ("TENS") unit helped alleviate the pain. (*Id.* at PageID.459).

Plaintiff then underwent arthroscopic right shoulder and biceps surgery on March 10, 2017, after being diagnosed with calcific tendonitis of the shoulder, shoulder tendinitis, biceps tendinosis, osteoarthritis, and impingement. (*Id.* at PageID.406). Plaintiff agreed to proceed with repeated injections and Dr. Linehan

imposed a 10-pound lifting restriction. (*Id.* at PageID.461). During ongoing

treatment, Plaintiff reported shoulder pain at a 5/10 (*Id.* at PageID.481) and back

pain between 6 and 7/10. (*Id.* at PageID.544).

At Plaintiff's seven month follow up with Dr. Linehan on October 19, 2017,

Plaintiff reported her shoulder was better than 10/10 pain before surgery, but it was

gradually getting more painful. She experienced pain with overhead reaching and

reaching away from her body. Plaintiff reported pain ranging from a 0 to a 9/10.

She used a variety of treatment. An August 2017 injection provided 75% relief for

two weeks. She was also using a TENS unit, heat, Norco, and Ibuprofen as

treatment, though the Ibuprofen caused bruising. She was not performing range of

motion exercises. (*Id.* at PageID.479).

As the injection provided only two weeks of relief, Dr. Linehan did not

recommend another. Dr. Linehan did recommend that Plaintiff stop using Mobic

and Ibuprofen to mitigate side effects. Dr. Linehan encouraged Plaintiff to work

on her range of motion exercises and to keep using her TENS unit for pain

management. Plaintiff agreed with the treatment plan. (*Id*. at PageID.480).

Amjed Aljanabi, M.D., her family medical doctor, continuously noted

Plaintiff's normal range of motion ("ROM") since Fall 2017. (*Id.* at PageID.535-

543). On June 29, 2018, Plaintiff reported no changes in pain to Dr. Aljanabi. She

was referred to the University of Michigan and then back to Dr. Linehan for

continuing treatment.  Plaintiff reported taking Norco as needed helped her pain.

Dr. Aljanabi noted Plaintiff showed limited abduction of the right shoulder, no

tenderness, no hip tenderness, and no signs of significant injury.  (*Id.* at

PageID.823).

> b) Back Issues

 Plaintiff saw Frank Schinco, M.D. on November 15, 2016 for low back pain

radiating to the knees, which was worse on the left.  Surgery was unnecessary.  Dr.

Schinco recommended anti-inflammatory medications, heat pads, and hot showers

to treat the pain.  Plaintiff agreed with his treatment plan.  (*Id.* at PageID.361).

On January 11, 2017, Plaintiff reported back pain as severe as 8/10 to Dr.

Madala.  She reported that her pain was alleviated by massage, pressure, and heat.

Her initial therapy of injections and physical therapy proved unsuccessful.  (*Id.* at

PageID.393).  On January 25, 2017, Plaintiff underwent an injection at Left L5 and

S1 by Dr. Madala.  (*Id.* at PageID.400).  By August 24, 2017, Plaintiff revealed

Norco and injections helped with her back pain, but she did not want to do any

more injections.  (*Id.* at PageID.544).

A June 2018 x-ray revealed mild degenerative disc disease from L1-2 to L5-

S1 level with no acute changes.  (*Id.* at PageID.656).  By January 2019, scans

showed moderate degenerative changes at C4-C5 and C6-C7 levels without

fracture or myelomalacia.  (*Id.* at PageID.655).  In March 2019, Plaintiff asked for

more back injections after reporting pain, as they helped significantly with pain before.  Dr. Aljanabi noted Plaintiff's normal ROM, lack of deformity, joint effusion, and tenderness. (*Id*. at PageID.808-10).

    c)  Knee Issues

In April 2019, Plaintiff reported she fell going up the stairs after her left knee "gave up," and hit her right knee on the steps.  (*Id.* at PageID.807).  In July 2019, Dr. Linehan diagnosed Plaintiff with knee pain (largely in the left knee) and started Plaintiff on knee injections, removed fluid from her knees, and encouraged Plaintiff to work on stretching and strengthening exercises at home.  Plaintiff was also fitted for a knee brace.  Plaintiff showed normal motor in both knees and stability to stress testing.  (*Id.* at PageID.1092-93).  Fluid studies of her knees suggested possible gout.  (*Id.* at PageID.1040-44).  In her July 10, 2019 Medical Source Statement, Dr. Linehan diagnosed Plaintiff with bilateral knee pain with a good prognosis and found that Plaintiff suffered no impairments from this condition.  (*Id.* at PageID.1049-52)

    d)  Urinary Issues

On October 11, 2017, Plaintiff discussed her urinary frequency with Dr. Aljanabi.  She reported she needed to wake up to use the bathroom every 30 to 60 minutes and failed to produce much urine.  During her hearing testimony, Plaintiff revealed that her bladder issues occur "only at night."  (*Id.* at PageID.90).  She was

diagnosed with interstitial cystitis and was treated with Elmirone.  (*Id.* at PageID.538).

Plaintiff later saw urologist Dr. Aditya Bulusu, M.D. to address her urinary issues.  Dr. Bulusu performed a cystoscopy on December 5, 2017.  (*Id.* at PageID.567).  Plaintiff was diagnosed with voiding dysfunction and prescribed Flomax.  (*Id.* at PageID.568).  On December 18, 2017, Dr. Bulusu performed a cystoscopy, bladder biopsy, and fulguration.  (*Id.* at PageID.569).

On January 9, 2018, Dr. Bulusu noted that a lesion found during Plaintiff's bladder biopsy was benign and she displayed no neoplasm or dysplasia.  But Plaintiff "still [had] a fair amount of irritative urinary symptoms of frequency and urgency and voiding small volumes."  Dr. Bulusu prescribed her new medication. (*Id.* at PageID.566).  On April 13, 2018, Plaintiff reported overall improvement, but still suffered from diminished urinary flow.  She was open to using Elmiron for treatment.  (*Id.* at PageID.783).  On May 7, 2018, Dr. Bulusu performed a cystoscopy, hydrodistension, urethral dilation, and DMSO instillation.  (*Id.* at PageID.787).  By May 31, 2018, Plaintiff reported no real changes and Dr. Bulusu considered trying a new prescription for treatment.  (*Id*. at PageID.783).

On April 19, 2018, Bradley Lewis, M.D., a state agency review physician, completed a physical residual capacity assessment of Plaintiff.  Dr. Lewis found that Plaintiff could occasionally lift or carry twenty pounds and frequently lift or

carry ten pounds.  Plaintiff can stand, walk, and sit for about six hours in an eight-hour workday.  She can climb stairs, balance, and kneel without limitations.  She can frequently stoop and crouch.  She can occasionally climb ladders and crawl.  She is limited in her right overhead reach and unlimited in handling, fingering, and feeling.  She has no visual, communicative, or environmental limitations.  Upon Dr. Lewis' review of the record, he found her claim partially consistent with evidence on file.  The severity of limitations she alleged was not substantiated by evidence on file.  (*Id.* at PageID.115-17).

### 2.  Mental Impairments

On September 26, 2016, Edward Jackson, M.D. noted Plaintiff's anxiety was chronic and gradually worsening.  (*Id.* at PageID.801).  On September 14, 2017 Dr. Aljanabi reported Plaintiff's anxiety improved mildly with counseling. (*Id.* at PageID.541).  On December 13, 2017, Plaintiff saw Dr. Aljanabi again because her anxiety was not under control and she could not sleep normally.  (*Id*. at PageID.535).  Plaintiff resumed treatment with Xanax.  (*Id.* at PageID.537).  By February 9, 2018, Plaintiff reported her anxiety was "stable although she still feels anxious with some panic attacks occasionally."  (*Id.* at PageID.608).  Plaintiff confirmed her anxiety was stable on March 30, 2018.  Dr. Aljanabi noted that she displayed linear thoughts, normal speech, was goal directed, had normal affect, and her insight and judgment appeared intact.  (*Id*. at PageID.827-28).

Plaintiff reported a panic attack the weekend of July 9, 2018.  Dr. Aljanabi again noted her linear and goal directed thoughts, normal speech and affect, and intact judgment.  (*Id.* at PageID.818-20).  On August 16, 2018, Plaintiff reported worsening anxiety and poor concentration.  Dr. Aljanabi referred Plaintiff for further psychiatric treatment.  (*Id.* at PageID.816).  Dr. Aljanabi continued to note her linear thoughts, normal speech and affect, and intact judgment.  (*Id.* at PageID.816-18).

Plaintiff started seeing psychiatrist Mohammad Jafferany, M.D. on September 5, 2018.  (*Id.* at PageID.928).  Ryan Cox, M.D., a psychiatry resident working under Dr. Jafferany treated Plaintiff.  (*Id.* at PageID.915).  Plaintiff started taking Lamictal to treat anxiety and possible bipolar disorder.  However, after developing a skin rash, she switched to Geodon.  (*Id.* at PageID.813).  Plaintiff reported "very high" anxiety to Dr. Jafferany on November 7, 2018.  During her exam she presented normal psychomotor activity, mood, speech, and affect.  She also showed logical, goal directed, linear, and organized thought.  (*Id.* at PageID.910-12).  By January 30, 2019, Plaintiff complained of OCD, insomnia, and anxiety.  She showed the same normal affect during her exam.  (*Id.* at PageID.897).

Edward Mike, Ph.D. treated Plaintiff from January 25, 2018 until March 8, 2018.  He completed a medical source statement on March 13, 2018.  Dr. Mike

diagnosed Plaintiff with generalized anxiety disorder.  Dr. Mike noted that in work, Plaintiff could become distracted when anxious and panicky.  Her strong sense of responsibility intensifies anxiety.  Her prognosis is for some improvement with reduced stressors.  (*Id.* at PageID.620-24).

On May 4, 2018, Marianne Georgen, Psy.D. completed a consultative examination of Plaintiff.  Based on her evaluation, she found Plaintiff could relate well with coworkers and supervisors.  Tasks should be simplified to start, gradually increasing in complexity.  She diagnosed Plaintiff with persistent depressive disorder and panic disorder.  Her prognosis was fair, and she can manage funds.  (*Id.* at PageID.647-52).

On May 17, 2018, Richard Zaloudek, M.D., a state agency reviewing physician, completed a psychological state agency review of Plaintiff.  Based on his evaluation, he found that Plaintiff is limited to simple one-to-three step tasks that do not require tight quotas and timeliness.  Her work settings should be relatively static with only occasional changes.  She can manage social contact and interactions in these work environments.  (*Id.* at PageID.120).

On December 12, 2018, Plaintiff reported worsening OCD and anxiety symptoms.  Her medications were increased, and she was encouraged to continue with therapy.  She showed the same normal affect during her exam.  (*Id.* at PageID.904-10).  Plaintiff continued to report struggles with sleep and focus and

10

showed normal affect.  (*Id.* at PageID.891).  After switching to Klonopin from Xanax, Plaintiff reported vastly improved sleep by April 10, 2019.  (*Id.* at PageID.885-89).  By May 8, 2019, Plaintiff's sleep and anxiety were still improving.  Plaintiff's depression was low, and she denied mood swings or irritability, though she still complained of struggles to concentrate.  (*Id.* at PageID.879).

On May 29, 2019, Dr. Cox completed a medical source statement diagnosing Plaintiff with unspecified bipolar disorder and OCD.  Dr. Cox found she would likely be off task 25% or more of the time, unable to maintain regular attendance, or carry out detailed instructions.  He also found Plaintiff may struggle to set realistic goals, make plans independently of others, or use public transportation.  Dr. Cox suggested Plaintiff may miss about two days of work every month.  (*Id.* at PageID.1030-33).

### C.  The Administrative Decision

Pursuant to 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), at **Step 1** of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 2, 2017, the alleged onset date.  (ECF No. 11, PageID.59).  At **Step 2**, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease, calcific tendinosis of the right shoulder status post tear and arthroscopy, osteoarthritis of the bilateral knees with

11

effusion status post injury, voiding dysfunction, persistent depressive disorder, generalized anxiety disorder, insomnia, and panic disorder.  (*Id.* at PageID.60).  At **Step 3**, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (*Id.*).  **Between Steps 3 and 4** of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC")[1] and determined that Plaintiff had the RFC:

> to perform light work . . .except the claimant can never climb ladders, ropes, or scaffolds, kneel, or crawl. She can occasionally climb ramps and stairs. The claimant can frequently stoop, crouch, and balance. The claimant can never perform overhead reaching with the right dominant arm. She can frequently reach forward, handle, and finger with the right dominant upper extremity. She can have frequent use of the neck throughout the workday. The claimant must avoid hazards such as unprotected heights or uncovered, unguarded moving machinery. The claimant can carry out simple instructions. She cannot perform work at a production rate that requires hourly quotas. The claimant can tolerate occasional changes in a routine work setting. She can occasionally interact with supervisors and coworkers but can never interact with the general public.

(*Id.* at PageID.62).  At **Step 4**, the ALJ determined that Plaintiff was unable to perform any past relevant work.  (*Id.* at PageID.69).  At **Step 5**, considering Plaintiff's age, education, work experience, and RFC, the ALJ determined there

---

[1] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

were existing jobs in significant numbers within the national economy that Plaintiff could perform, such as machine tender, line assembler, and a folder. (*Id.* at PageID.70). The ALJ therefore concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, since February 2, 2017, through the date of the decision. (*Id.*).

### D.    Framework for Disability Determinations

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; (4) can return to past relevant work; and (5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §§ 404.1520, 416.920.[2] The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that notwithstanding the claimant's

---

[2] Citations to the regulations or Social Security Rulings are to those effective on the date of the application for disability benefits or the ALJ's decision, where appropriate, unless otherwise indicated.

impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy. *Richardson v. Sec'y of Health & Hum. Services*, 735 F.2d 962, 964 (6th Cir. 1984).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007);

*Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## F.    Analysis

Plaintiff makes three arguments in favor of remand, contending first that the ALJ erroneously evaluated medical opinion evidence from her treating physician, Dr. Ryan Cox. (ECF No. 14, PageID.1132). Second, she alleges the ALJ failed to adequately account for the impact of her voiding dysfunction impairment on her

RFC.  (*Id.* at PageID.1138).  Third, she argues the ALJ erred by improperly

discounting her subjective complaints.  (*Id.* at PageID.1140).

      1.  Evaluation of Treating Physician Dr. Cox's Opinion

Plaintiff argues the ALJ failed to properly credit Dr. Cox's medical opinion

evidence.  (*Id.* at PageID.1132).  The Commissioner responds the ALJ properly

found Dr. Cox's opinion inconsistent with the record given substantial evidence in

the record showing Plaintiff could mentally perform a range of simple work.  (ECF

No. 17, PageID.1157).  The Commissioner also notes that Plaintiff's request for

remand asks the court to improperly re-weigh evidence.  (*Id.* at PageID.1162).  In

reply, Plaintiff explains that she is not asking the court to re-weigh evidence but

highlighting that the ALJ improperly rejected Dr. Cox's opinion in reversible error.

(ECF No. 18, PageID.1177).

In review, the ALJ will assess both treating and non-treating medical

evaluations based on how well they are supported by the rest of the record.  20

C.F.R. §§ 404.1520c(a), 416.920c(a) ("We will not defer or give any specific

evidentiary weight, including controlling weight, to any medical opinion(s) or prior

administrative medical finding(s), including those from your medical sources").

The factors an ALJ must consider in evaluating medical opinions include

supportability and consistency with the record as a whole; relationship with the

claimant; length of the treatment relationship; frequency of examinations; purpose

and extent of the treating relationship; whether the source has examined the claimant; specialization; and any other factors that support or undermine the medical opinion.  §§ 404.1520c(c), 416.920c(c).  ALJs must articulate the "most important factors of supportability and consistency" of the medical opinions but "are not required to . . . explain" the consideration given to the remaining factors.  §§ 404.1520c(a-b); 416.920c(a-b).

Under the regulations, "supportability" means the "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be."  20 C.F.R. §§ 404.1520c(c)(1); 416.920c(c)(1).  For "consistency," the regulations explain that the "more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be."  20 C.F.R. §§ 404.1520c(c)(2); 416.920c(c)(2).

The ALJ sufficiently expounds how he found Dr. Cox's opinion was unsupported, because he explains how Dr. Cox's opinion conflicts with objective medical evidence on record.  The more relevant the supporting objective medical evidence and explanations are, the more persuasive a medical opinion can be.  20 C.F.R. §§ 404.1520c(c)(1); 416.920c(c)(1).  When an ALJ finds an opinion "inconsistent with the objective evidence throughout the record, she is simply

weighing the objective evidence in terms of supportability as promulgated by the regulations." *Bundy v. Comm'r of Soc. Sec.*, No. 20-10254, 2021 WL 1822311, at *12 (E.D. Mich. Jan. 29, 2021), *report and recommendation adopted*, No. 20-10254, 2021 WL 1220867 (E.D. Mich. Mar. 31, 2021).  For example, an ALJ may note that the medical provider contradicts his own opinion with treatment notes elsewhere in the record.  *Id.*  (finding that the ALJ permissibly weighed other objective evidence on record in terms of supportability when the ALJ noted the doctor's "own reports in the record seem to contradict his opinion…").

In explaining his analysis of Dr. Cox's opinion, he cites her "unremarkable" mental status examinations.  (ECF No. 11, PageID.68).  Mental status examinations and treatment notes by Dr. Cox charted Plaintiff's generally intact attention, concentration, memory, insight, and judgment.  (*Id*. at PageID.879-888).  She also displayed linear thought process, logic, and was pleasant, cooperative, and goal directed.  (*Id.*).  The ALJ finding moderate psychological limitation is supported by substantial evidence drawn from the mental status exams.  *See Tucker v Comm'r of Soc. Sec.*, 775 F. App'x 220, 224 (6th Cir. 2019) (ALJ did not err by relying in part on "largely normal" mental status examinations with "minimal or no impairment of memory, concentration, attention or judgment.").  The ALJ references Plaintiff's latest (2019) treatment records, which include Dr. Cox's own treatment notes charting Plaintiff's "drastically" improved sleep, improved anxiety,

low depression, lack of mood swings, with lingering struggles to concentrate. Most of these notes predate Dr. Cox's opinion.  (*See id.* at PageID.879-885).  Like the ALJ in *Bundy*, the ALJ here cited a doctor's own reports to weigh the supportability of medical opinion evidence.  *Bundy*, 2021 WL 1822311, at 12*. This is the type of objective medical evidence an ALJ can weigh against opinion evidence to weigh supportability.

The ALJ also sufficiently explains why Dr. Cox's opinion conflicts with the record because he explains how Dr. Cox's findings contrast with Plaintiff's treatment history, mental status examinations, and testimony.  (*Id.* at PageID.68). The more consistent an opinion is with the rest of the record, the more persuasive an ALJ may find it.  20 C.F.R. §§ 404.1520c(c)(2); 416.920c(c)(2).  An ALJ can draw from the record as a whole in crafting the RFC.  *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 727-728 (6th Cir. 2013) (rejecting contention ALJ was "bound" by one medical opinion - ALJ "properly based her RFC determination on all the evidence of record").  The ALJ discussed Plaintiff's treatment history for five pages before his medical opinion assessment.  (*Id.* at PageID.63-68).  In rejecting Dr. Cox's opinion, he cites her treatment records indicating improvement. He also discusses how Plaintiff's own lifestyle does not support Dr. Cox's finding. Plaintiff could attend church and shop.  Plaintiff's work required wound care, tracheotomy changing, and catheter emptying.  Her job required prompt attention

and the ability to carry out tasks independent of others.  In the opinion of the ALJ, the nature of her job contradicted Dr. Cox's opinion.  (*Id.* at PageID.68).  The ALJ explained how the medical and non-medical evidence on record is inconsistent with Dr. Cox's finding.

The ALJ's rejection of Dr. Cox is sufficiently articulated and supported by substantial evidence.  His contention that Dr. Cox's opinion differs from objective medical evidence and thus not supported is adequately explained and supported by substantial evidence.  Further, his finding that Dr. Cox's opinion differs from the record sufficiently describes the opinion's contrast with the record and is supported by substantial evidence.  Even if substantial evidence supports Dr. Cox's opinion, reviewing the record again to arrive at a contrary conclusion would be reweighing the evidence, and the court will not reweigh the evidence considered by the ALJ. *Big Ranch Res., Inc. v. Ogle*, 737 F.3d 1063, 1074 (6th Cir. 2013) ([w]e do not reweigh the evidence or substitute our judgment for that of the ALJ.") (quoting *Tennessee Consol. Coal Co. v. Kirk*, 264 F.3d 602, 606 (6th Cir. 2001)).  A remand on this basis is improper.

## 2.  Evaluation of Voiding Dysfunction Impact on RFC

Plaintiff argues the ALJ failed to adequately account for the impact of her voiding dysfunction impairment on her RFC.  (ECF No. 14, PageID.1138).  The Commissioner contends the ALJ properly considered plaintiff's voiding

dysfunction, as the ALJ found her condition severe but not severe enough to increase Coston's limitations beyond those already included in the RFC.  (ECF No. 17, PageID.1164-65).  In reply, Plaintiff reasons the ALJ ignored how insomnia resulting from her voiding dysfunction limits her ability to work full-time warranting remand.  (ECF No. 18, PageID.1178).

The ALJ found Plaintiff's voiding dysfunction a severe impairment at Step Two.  (ECF No. 11, PageID.60).  At Step Four, the ALJ must consider a claimant's RFC.  The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.  20 C.F.R. §§ 404.1545(a), 416.945(a); *Howard*, 276 F.3d at 239.  Severe impairments may or may not affect a claimant's residual functional capacity.  *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007).  "[T]o the extent an ALJ determines that an identified impairment, severe or *non-severe*, does not result in any work-related restrictions or limitations, the ALJ 'is required to state the basis for such conclusion.'"  *Katona v. Comm'r of Soc. Sec.*, No. 14-10417, 2015 WL 871617, at *6 (E.D. Mich. Feb. 27, 2015) (quoting *Hicks v. Comm'r of Soc. Sec.*, 2013 WL 3778947, at *3 (E.D. Mich. July 18, 2013)); *see also Burton v. Comm'r of Soc. Sec.*, No. 18-13103, 2020 WL 57612, at *2 (E.D. Mich. Jan. 6, 2020) (ALJ did not properly address Plaintiff's headaches when ALJ did not address headaches at all in decision).

The ALJ sufficiently addressed why Plaintiff's voiding dysfunction ultimately had no impact on Plaintiff's RFC.  In discussing her voiding dysfunction's impact on her RFC, the ALJ said:

> The claimant reported urinary frequency at night. She underwent a bladder biopsy, which was benign.  In early 2018, the claimant indicated Troponin was helping, but she ran out and asked for a refill.  Because this issue occurs at night only, I did not find additional limitations beyond those included in the residual functional capacity above were warranted.

(ECF No.11, PageID.65).  The ALJ explained why Plaintiff's voiding dysfunction did not impact her RFC.  Plaintiff's urinary frequency impacted her most at night. This finding is supported by substantial evidence on record.  Plaintiff reported to her doctor that she must "wake up" every 30 to 60 minutes to urinate and that her condition is worse at "nighttime."  (*Id.* at PageID.538).  She also confirmed during her testimony that her bladder issues occur "only at night."  (*Id.* at PageID.90).  A reasonable mind could agree with the ALJ's assessment that an issue that occurs exclusively at night has little effect on what a claimant can do in a daytime work setting.

Plaintiff argues this reasoning disregards the insomnia caused by her nighttime urination issues.  (ECF No. 14, PageID.1140).  That said, the ALJ does account for the effect of Plaintiff's insomnia on her RFC, as he includes insomnia in his analysis of Plaintiff's mental limitations.  (ECF No.11, PageID.65).  He also

22

accounts for her insomnia in Plaintiff's RFC finding Plaintiff must "avoid hazards such as unprotected heights or uncovered, unguarded moving machinery." (*Id.* at PageID.69). Though Plaintiff finds the ALJ failed to appreciate the severity of her voiding dysfunction and resulting insomnia, there is enough in the record so a reasonable mind could agree that nighttime bladder issues have no additional impact on the RFC.

Unlike *Katona* and *Burton*, the ALJ here did in fact describe what impact Plaintiff's condition had on his RFC determination. The ALJ's analysis of *Katona*'s mental impairments was insufficient because he never mentions them during his RFC analysis, leaving the court to wonder what impact the limitation would have on Katona's RFC. *Katona*, 2015 WL 871617, at *7. The ALJ here does mention Plaintiff's voiding dysfunction in his RFC analysis. He describes exactly what additional impact the voiding dysfunction has on his RFC analysis— none. (ECF No.11 PageID.65). The undersigned need not wonder how Plaintiff's voiding dysfunction impacted the ALJ's RFC analysis because the ALJ made it clear. The ALJ also did not force the undersigned to make a logical leap like the court refused to do in *Burton*. In *Burton*, the court did not support the "logical leap" necessary to connect the ALJ's discussion of plaintiff's difficulties getting out of bed with plaintiff's headaches that made him bedridden. *Burton*, 2020 WL 57612, at *2. The ALJ did not explicitly address plaintiff's headaches in the RFC

analysis, so remand was proper.  *Id.*  The undersigned need not take a similar

logical leap here, as the ALJ addressed Plaintiff's voiding dysfunction and what

impact it had on his RFC determination.  The ALJ adequately described what

impact Plaintiff's voiding dysfunction had on his RFC determination and this

determination is supported by substantial evidence.  The ALJ did not commit

reversible error on this basis.

### 3.   Evaluation of Coston's Subjective Complaints

Finally, Plaintiff argues the ALJ erred by improperly discounting her

subjective complaints.  (ECF No. 14, PageID.1140).  The Commissioner maintains

substantial evidence supports the ALJ's partial discounting of Plaintiff's subjective

symptoms, as Plaintiff's testimony conflicted with the record.  (ECF No. 17,

PageID.1166-67).  In reply, Plaintiff claims the ALJ relied too heavily on state

agency opinions and selectively cited Plaintiff's day-to-day activities to reject her

subjective complaints warranting remand.  (ECF No. 18, PageID.1179-81).

SSR 16–3p sets forth the standard for evaluating the alleged limitations

using a two-step process.  2017 WL 5180304, at *3 (Oct. 25, 2017).  First, the ALJ

determines whether the claimant has a medically determinable impairment that

could reasonably be expected to produce the alleged symptoms.  *Id.*  The ALJ

acknowledged that Plaintiff's impairments could reasonably be expected to cause

her alleged symptoms.  (ECF No.11, PageID.63).

24

Second, the ALJ must evaluate the intensity and persistence of alleged symptoms and determine whether the alleged symptoms limit the claimant's ability to work.  SSR 16-3p at *3-4.  When reviewing alleged symptoms, the ALJ must consider "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record."  *Id.* at *4; 20 C.F.R. §§ 404.1529(c)(3), 416.929.

Here, the ALJ found that Plaintiff's claims of limitation strayed from the medical evidence and other evidence in the record.  (ECF No.11, PageID.63).  When reviewing an ALJ's credibility determination of a claimant's subjective complaints, a court may affirm the ALJ's decision if it is supported by substantial evidence.  *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citations omitted).  For example, an ALJ who selectively cites medical evidence to cast the claimant in a more capable than accurate light may commit reversible error.  *Howard*, 276 F.3d at 240-41 (finding reversible error when ALJ relied on selective reading of exhibits in record to form RFC).  The ALJ must give specific reasons for their decision that are supported by evidence in the record and make clear what weight he gave the claimant's complaints and why he gave it that

weight.  *Rogers*, 486 F.3d at 249.  Finding inconsistencies between subjective

complaints and the rest of the record tend to undermine the credibility of a

claimant.  *Id.* at 247-48.

The ALJ gave specific reasons for his credibility determination that are

supported by evidence in the record.  The ALJ explains he found Plaintiff's

testimony partially consistent with the rest of the record for "reasons explained

throughout the decision."  (ECF No.11, PageID.63).  First, the ALJ details how

Plaintiff's self-reported activities contradict the degree of limitation Plaintiff

claimed.  (*Id.*).  Then, he details how the medical evidence conflicts with the

degree of limitation Plaintiff alleged.  (*Id.* at PageID.64-66).  Finally, the ALJ

reviews how medical opinions and prior administrative findings do not support the

degree of limitation Plaintiff alleged.  (*Id.* at PageID.66-68).  The ALJ provided a

detailed analysis that focused on both objective and subjective evidence, unlike the

ALJ in *Rogers*, where brief analysis and over-emphasis on objective findings was

inappropriate and cause for remand.  *Rogers*, 486 F.3d at 248.  Here, the ALJ's

analysis was "'sufficiently specific to make clear … the weight the adjudicator

gave … and the reasons for that weight.'"  *Id.* at 249 (internal citations omitted).

The ALJ detailed how the inconsistencies between Plaintiff's subjective

complaints and the record undermine Plaintiff's credibility.

The ALJ's detailed credibility finding is supported by substantial evidence in the record.  The medical evidence included treatment notes from April 2016 until July 2019.  (ECF No.11, PageID.63-66).  Plaintiff's treatment notes chart impairments the ALJ found did not cause disabling limitations.  For example, Plaintiff did not need surgery for degenerative changes of her lumbar and cervical spine, because she could be successfully treated with medication and back injections as needed.  (*Id.* at PageID.361;544;808).  Plaintiff's calcific tendinosis of the right shoulder post tear and arthroscopy was treated with surgery, then injections and pain relievers as needed.  (*Id.* at PageID.406;461;479-80).  Dr. Aljanabi noted her normal ROM since Fall 2017.  (*Id.* at PageID.535-543).  Before then, there was limited ROM in the back, limited right shoulder abduction, "mildly reduced," and "decreased" ROM dating back to the onset date.  (*Id.* at PageID.547-558).  After being diagnosed with degenerative joint disease and gout of the knees in 2019, Plaintiff still showed normal ROM in both knees and stability.  (*Id.* at PageID.1092).  Plaintiff's voiding dysfunction only occurred at night.  (*Id.* at PageID.90).  Plaintiff's psychiatry treatment plotted her generally intact attention, concentration, memory, insight, and judgment.  (*See id.* at PageID.879-888).  She also exhibited linear thought process, logic, and was pleasant, cooperative, and goal directed.  (*Id.*).  The ALJ also relied on reports from state agency experts Drs. Lewis and Zaloudek.  Upon Dr. Lewis' review of the record, he found her claim

partially consistent with evidence in the record, as the severity of limitations she alleged was not substantiated by evidence on file.  (*Id.* at PageID.114-15).  After Dr. Zaloudek's review, he found she could function in stable jobs with occasional changes and the social interactions within those jobs.  (*Id*. at PageID.120).

The ALJ also found Plaintiff described "activities that are not limited to the extent one would expect … given [her] complaints of disabling symptoms and limitations."  (*Id.* at PageID.63).  The ALJ referenced Plaintiff's December 2017 function report, in which she revealed she can drive, manage her finances, shop, read, visit neighbors, and belonged to a church.  (*Id.* at PageID.281-88).  Plaintiff argues that like the ALJ in *Howard*, the ALJ here committed reversible error as he only considered part of the report in formulating the RFC.  (ECF No. 14, PageID.1143) (citing *Howard*, 276 F.3d at 240-41).  While the ALJ does selectively cite this function report, any error the ALJ committed is distinguishable from *Howard* and not cause for remand.  Unlike the ALJ in *Howard*, the ALJ here did not rely on a selective reading of medical reports to form the RFC in reversible error.  *Id.*  Rather, the ALJ here selectively cited Plaintiff's subjective complaints, not objective medical evidence, and he did not rely on this report to form the RFC.

The ALJ also referenced Plaintiff's testimony concerning her part-time job.  (*Id.* at PageID.63-64).  Plaintiff worked every other weekend with an in-home patient doing assessment, vitals, lung care treatment, trach change, and emptying a

full catheter.  She did this work with no reported problems.  (*Id.* at PageID.85).

Plaintiff argues her part-time work cannot serve as evidence of her ability to work

full-time.  (ECF No. 14, PageID.1144) (citing *Childress v. Colvin,* 845 F.3d 789,

792 (7th Cir. 2017) (holding claimant's part-time work, and ability to live alone

and care for himself "feeble" points viewed in context of disabling heart

condition).  That said, the ALJ relied on her part-time employment as one factor to

form the RFC, as permitted by the regulations.  *See Miller v. Comm'r of Soc. Sec*.,

524 F. App'x 191, 194 (6th Cir. 2013) ("the ALJ did not err by considering

Miller's ability to maintain part-time employment as one factor relevant to the

determination of whether he was disabled.") (citing 20 C.F.R. §§ 404.1529(c)(3),

404.1571, 416.929(c)(3), 416.971).

The ALJ rightfully relied on Plaintiff's subjective complaints, objective

medical evidence, and other evidence in the record to form the RFC.  SSR 16-3p at

*3-4; 20 C.F.R. §§ 404.1529(c)(3), 416.929.  To the extent that Plaintiff argues the

ALJ "cherry picked" evidence to make her seem more capable, this argument has

little merit.  The Sixth Circuit has frowned upon these types of "cherry-picking"

arguments as calling for an impermissible re-weighing of evidence.  *DeLong v.

Comm'r of Soc. Sec. Admin*., 748 F.3d 723, 726 (6th Cir. 2014).  Because the

administrative findings are well supported and explained, the deference generally

accorded an ALJ's credibility determination is appropriate here.  *Cruse*, 502 F.3d

at 542 (ALJ's evaluation of the subjective claims entitled to deference).  Thus,

substantial evidence supports the ALJ's evaluation of Plaintiff's subjective

complaints and there is no cause for remand.

### G.    Conclusion

Plaintiff has the burden of proof on her statements of error.  *Walters*, 127

F.3d at 529.  Plaintiff has not shown legal error that would upend the ALJ's

decision. For these reasons, it is **RECOMMENDED** that the Court **DENY**

Plaintiff's motion for summary judgment (ECF No. 14), **GRANT** Defendant's

motion for summary judgment (ECF No. 17), and **AFFIRM** the Commissioner of

Social Security's decision.

## II.    PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to file any objections within 14 days of service,

as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule

72.1(d).  Failure to file specific objections constitutes a waiver of any further right

of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and*

*Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation.  *Willis v. Sec'y of Health*

*and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers Loc. 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2,"

etc.  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2), Local Rule 72.1(d).

The response must specifically address each issue raised in the objections, in the

same order, and labeled as "Response to Objection No. 1," "Response to Objection

No. 2," etc.  If the Court determines that any objections are without merit, it may

rule without awaiting the response.

Date: January 24, 2022                    s/Curtis Ivy, Jr.
                                          Curtis Ivy, Jr.
                                          United States Magistrate Judge